No. 78,786

STATE OF KANSAS, *Appellee*, v. ADAM VALDEZ, *Appellant*.

(977 P.2d 242)

Opinion filed March 5, 1999.

*Ricklin R. Pierce*, of Ricklin R. Pierce, Chartered, of Garden City, argued the cause and was on the briefs for appellant.

*Robert R. Johnson*, assistant county attorney, argued the cause, and *John P. Wheeler, Jr.*, county attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: The defendant appeals, raising 11 issues which include his certification as an adult; trial errors regarding his convictions of premeditated first-degree murder, aggravated kidnapping, conspiracy to commit murder, conspiracy to commit aggravated kidnapping, aggravated robbery, and aggravated battery; and the imposition of the 40-year mandatory prison sentence.

On February 3, 1996, a group of young people met to party at a residence in Garden City, Kansas. The group included several members of a local gang, the Young Crowd (Y.C.) and others who were not gang members. The defendant, Adam Valdez, age 17, was a Y.C. member. The victim, Juan Ayon, age 33, was not a Y.C. gang member.

During the party, an argument developed between a Y.C. member and Ayon. When the argument became physical, the Y.C. members converged on Ayon and started beating him. The fray moved outside to the front porch. The conflict ended with Ayon laying with his head hanging over the edge of the front porch bleeding profusely from the face and head and unable to defend himself while the Y.C. members hit and kicked him.

The young man who resided at the house stopped the beating by bringing his pit bulldog to the porch. The crowd went into the residence. Several individuals, including Richard Garcia, the leader of the Y.C.'s, Jose Avalos, and Valdez met in the bathroom for a conversation concerning the victim, Ayon. Richard Garcia ordered Valdez and Avalos to "go take care of him."

Valdez, Avalos, and Ayon left the party in Ayon's car at about 4:30 a.m on February 4, 1996. The injured Ayon was lying on the back seat of his car.

At 5:30 a.m. on February 4, 1996, Ayon's abandoned car was found by police on Taylor street. The car had been vandalized and was soiled with copious amounts of blood. Shoe impressions in the

snow around the car and in the vicinity indicated that two individuals exited the car, wandered through the neighborhood, and were picked up by another car a short distance from the abandoned car. Later that day, Ayon's body was found in an isolated field outside Garden City. Ayon's body appeared to have been run over several times by a car.

The police investigation uncovered circumstantial and forensic evidence that led to the arrest and indictment of Valdez, Avalos, and others. The statements of Kamber Snyder, a guest at the party on Chesterfield Street, and Jose Avalos were of primary importance in narrowing the focus of the police investigation to Jose Avalos and Adam Valdez. Kamber Snyder told police that a couple days after the party, she confronted Avalos and Valdez regarding their involvement in the killing of Juan Ayon. Both admitted to Kamber Snyder that they had killed Juan Ayon.

In an interview with police on February 20, 1996, Jose Avalos admitted that he and Valdez had killed Ayon. Avalos stated that following the fight on the front porch, Avalos, Valdez, Richard Garcia, the leader of the Y.C. gang, and others, met in the bathroom. The defendant told Richard Garcia that they had to take care of Ayon. Garcia replied, "It's up to you, you take care of him then." Avalos, who was told to accompany Valdez, stated that he did not want to go with Valdez. Richard Garcia informed Avalos that if he did not go, he would be "jumped out" of the gang and would not deserve to live.

Avalos told police that Valdez drove Ayon's car to a sandpit area where Valdez pulled Ayon from the car. When Valdez returned to the car, he drove in circles, running over Ayon numerous times. Avalos stated he felt the car going over the body of Ayon and heard the sound of the car hitting tall weeds as it drove over the terrain. Valdez then drove to Taylor Street where he abandoned the car. Valdez climbed on the hood and kicked in the windshield. Because Valdez' blue Dickies coat, black jeans, and black Nike tennis shoes were soiled with blood, they stopped at Valdez' home so Valdez could clean up.

Prior to Valdez' trial, Jose Avalos pled guilty to felony murder. As agreed, the State dropped several charges against Avalos, including premeditated murder.

After his arrest, Valdez was certified to stand trial as an adult. The case was tried to a jury. Valdez was found guilty of first-degree premeditated murder, aggravated kidnapping, conspiracy to commit murder in the first degree, conspiracy to commit aggravated kidnapping, aggravated robbery, and aggravated battery. Prior to Valdez' sentencing, the State moved for imposition of the mandatory 40-year sentence. The trial judge granted the motion. Valdez was sentenced to life imprisonment (hard 40 sentence) for first-degree premeditated murder, 97 months for aggravated kidnapping (consecutive to murder sentence), 73 months for conspiracy to commit murder (concurrent with kidnapping sentence), 49 months for conspiracy to commit aggravated kidnapping (concurrent with conspiracy to commit murder sentence), 49 months for aggravated robbery (consecutive to previous sentences), and 43 months for aggravated battery (consecutive to previous sentences). Valdez appealed directly to the Supreme Court pursuant to K.S.A. 22-3601(b)(1).

## CERTIFICATION AS AN ADULT

The standard for an appellate court to evaluate whether the district court's decision to certify a juvenile as an adult was proper is whether the decision as a whole is supported by substantial competent evidence. The insufficiency of the evidence pertaining to one or more of the factors listed is not determinative. *State v. McIntyre*, 259 Kan. 488, 498, 912 P.2d 156 (1996).

In 1996, K.S.A. 38-1636(a)(2) provided that the court may authorize the prosecution of a respondent 16 or more years of age as an adult. K.S.A. 38-1636(e) required consideration of the following eight factors:

"(e) . . . (1) The seriousness of the alleged offense and whether the protection of the community requires prosecution as an adult; (2) whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner; (3) whether the offense was against a person or against property, greater weight being given to offenses against persons, especially if personal injury resulted; (4) the number of alleged offenses unadjudicated and pending against the respondent; (5) the previous history of the respondent, including whether the respondent had been adjudicated a delinquent or miscreant under the Kansas juvenile code or a juvenile offender under this code and, if so, whether the offenses were against

persons or property, and any other previous history of antisocial behavior or patterns of physical violence; (6) the sophistication or maturity of the respondent as determined by consideration of the respondent's home, environment, emotional attitude, pattern of living or desire to be treated as an adult; (7) whether there are facilities or programs available to the court which are likely to rehabilitate the respondent prior to the expiration of the court's jurisdiction under this code; and (8) whether the interests of the respondent or of the community would be better served by criminal prosecution."

K.S.A. 38-1636(b) and (g) provided that the motion requesting that the court authorize prosecution of a juvenile as an adult may also contain a request by the prosecuting attorney to allow the introduction of evidence of the offenses alleged in the complaint and a request that, on hearing the motion and authorizing prosecution as an adult, the court make the findings required in a preliminary examination and the finding that there is no necessity for further preliminary examination. Therefore, the hearing where the court authorizes prosecution of the juvenile as an adult may also serve as the preliminary examination.

In this case, the certification hearing and the preliminary examination were conducted at the same time. The evidence presented by the State was to determine Valdez' status as a juvenile or if he should be prosecuted as an adult for the offense and to determine if there was probable cause to bind him over for arraignment. The evidence pertaining to certification as an adult included testimony by the crime investigation officers, friends of the defendant, the defendant's mother, school officials, and police officers. We will review that evidence.

Detective Morgan Wright of the Garden City police department testified the evidence he obtained at the crime scenes strongly supported an inference that Ayon had been run over multiple times with his own car. Blood was found on the car's passenger side headlight, the driver's side door and fender, the side quarter panel, the tires, the gas tank, the underside of the car, the side mirror, the right side of the windshield, across the cowling, and around the area of the catalytic converter.

Detective Goeman of the Finney County Sheriff's Office photographed Ayon's body in the morgue prior to and during the au-

topsy. Goeman testified that the clothing and body of Juan Ayon were soiled with black and blue tire marks. He stated that in his law enforcement career of 25 years, he had investigated 20-25 homicides. In Goeman's opinion, the murder of Juan Ayon was a very brutal crime.

Kamber Snyder, age 15, was at the party where the initial beating of the victim occurred. Snyder testified that she saw Valdez and Avalos beating and kicking Juan Ayon on the porch of the residence. After the beating, Ayon was bleeding profusely from his face.

Carlos Valencia, age 20, testified on behalf of the State in hopes of favorably influencing plea negotiations in a pending criminal case against him. He stated that he and Adam Valdez were very good friends. A few days after the murder, Valdez told Valencia that he, referring to Valdez, and Jose Avalos had driven Ayon to a location on Burnside Drive where he had repeatedly run over Ayon with Ayon's car.

Dr. Bruce Melin, M.D., the pathologist who performed the autopsy of Juan Ayon, testified that Ayon's injuries were inflicted during two time frames: Ayon sustained head injuries at least one-half hour prior to his death and later sustained massive injuries to his trunk and extremities close to or at the time of his death. Ayon's head wounds were described as disfiguring and would have necessitated medical attention. The head wounds were not life-threatening injuries. The cause of Ayon's death was massive blunt trauma to his trunk with exsanguination (massive blood loss). The pattern of injuries indicated that Ayon had been run over by a car more than once from different directions.

Maria Garcia, Valdez' stepmother, testified that in the 2 years preceding the murder, Valdez had gone to school for only 2 weeks. He had quit school prior to the murder. Although Valdez lived at home with Maria and his father, he spent much of his time at the home of his older brother, Walter. According to police gang tracking reports, Valdez' brother, Walter, age 20, was also a member of the Y.C.

Jonelle Erskin, who was in charge of the records department in Valdez' school district, testified that the last time Valdez attended

school regularly was the sixth grade in 1991-92. Valdez re-enrolled in 1994. His attendance was sporadic, and he was dropped from the school rolls for truancy in December 1994. Connie Stucky, a youth officer for the middle school, testified that she had notified Valdez' parents regarding his truancy problem, but neither parent had responded.

Detective William Relph, the Garden City Police Department's expert on gang culture and issues, testified that the Y.C. gang had been active in Garden City for approximately 4 years. Detective Relph stated that his first contact with Valdez as a gang member was in 1995. He confirmed that most of the individuals at the party on Chesterfield street were gang members or associates. Detective Relph testified that, according to his records, Valdez had been involved in violent gang activity on at least five prior occasions.

Hyong Perkins, patrol officer with the Garden City Police Department, testified that he had had contact with Valdez in the past where Valdez had exhibited disrespect and contempt for the authority of the police department. On one occasion, Perkins had stopped Valdez to inform Valdez that a detective wanted an interview with him. Valdez had responded by throwing gang signs and stating, "Fuck the police; you motherfucking pigs; you'll get yours because we're Y.C."

Valdez' testimony was limited to the certification issue. Valdez stated that since his incarceration, he had experienced no problems in the system. He had not been written up. He had been subject to a lock down when the cell population was punished for breaking up brooms and "everything like that." Even though he had been housed with adults and rival gang members, he had not gotten into any fights. Regarding the jailers, Valdez stated, "They haven't done nothing to me, nothing like that, so I'm going to respect 'em." Valdez testified that he got "jumped out" of the Y.C. gang in November, prior to the murder in February.

Valdez' first complaint is that the State was allowed to present witnesses, Officer Perkins, Jonelle Erskin, and Connie Stucky, who had not been endorsed on the complaint prior to the combined hearing. Although the witnesses Valdez complains of testified as to certification for prosecution as an adult, they did not later testify

at his criminal trial. Was it error for the trial court to allow the testimony of witnesses for the certification determination who had not been previously endorsed on the complaint as witnesses?

An action under the Kansas Juvenile Offenders Code, K.S.A. 38-1601 *et seq.*, is commenced by the filing of a verified complaint. K.S.A. 38-1622(a)(5) provides for the endorsement of witnesses in a juvenile offender action:

"The prosecuting attorney shall endorse the names of all witnesses known to the attorney upon the complaint at the time of filing. The prosecuting attorney may endorse on the complaint the names of other witnesses that afterward become known to the attorney, at such times as the court prescribes by rule or otherwise."

The purpose of the endorsement of witnesses requirement in a criminal action and a juvenile offender action is to prevent surprise to the individual and to allow that person the opportunity to interview and examine the prosecution witnesses prior to trial or the adjudication hearing. *State v. Timley*, 255 Kan. 286, 304, 875 P.2d 242 (1994) (quoting *State v. Green*, 252 Kan. 548, 553, 847 P.2d 1208 [1993]).

K.S.A. 22-3201(g) of the Kansas Code of Criminal Procedure also requires the prosecuting attorney to endorse the names of all witnesses known to the prosecuting attorney upon the complaint, information and indictment at the time of filing. The prosecuting attorney is allowed to endorse the names of other witnesses that may afterward become known to the prosecuting attorney.

The State was required to endorse all its witnesses prior to Valdez' certification/preliminary hearing. However, the issue of the endorsement was raised by Valdez at the hearing, and the court allowed the previously unendorsed witnesses to testify.

A trial court's order permitting a late endorsement of a witness is not to be overturned absent an abuse of discretion. The test is whether the defendant's rights have been prejudiced. Appellate courts are not to condone surprise caused by the intentional withholding of the name of a witness as a part of the prosecution's trial strategy. The purpose of the endorsement requirement is to prevent surprise to the accused and to give him or her an opportunity to interview and examine the witnesses for the prosecution in ad-

vance of trial. The trial court commits reversible error in allowing a late endorsement when surprise prevents a fair preparation of the accused's defense. *State v. Bryant*, 227 Kan. 385, 387, 607 P.2d 66 (1980).

The district judge has broad discretionary power to allow the late endorsement of a witness under K.S.A. 22-3201(g) and K.S.A. 38-1622(a)(5). The district judge did not abuse his discretion in permitting a late endorsement.

Valdez next complains that the State presented no evidence regarding factor (7) in K.S.A. 38-1636(e), the facilities and programs available in the juvenile system to rehabilitate the juvenile. The statute does not require evidence supporting all eight factors, only that those factors be considered by the court. *State v. Irvin*, 16 Kan. App. 2d 214, 220, 821 P.2d 1019 (1991). Therefore, there was no error in failing to present evidence regarding this factor.

Valdez' primary contention regarding the certification hearing is that the trial court did not consider all of the factors listed in K.S.A. 38-1636(e) for determining the certification question. The record shows that Valdez' argument is without merit.

The standard for evaluating whether the decision to certify a juvenile as an adult was proper is whether the decision as a whole is supported by substantial competent evidence. It is not error for a court to give greater weight to some factors than it gives to others. The trial court is not required to give the factors listed in K.S.A. 38-1636(e) equal weight. See *State v. Irvin*, 16 Kan. App. 2d 214, Syl. ¶ 2.

Before making her decision, the judge announced that she would consider the criteria listed in K.S.A. 38-1636(e). Although the judge did not make formal findings as to each factor, she clearly gave consideration to each one and reviewed the evidence presented. When rendering her decision, the district judge stated that after considering, in particular, Valdez' lack of respect for authority, lack of school attendance, and lack of a stable home, there was little or nothing in favor of retaining juvenile jurisdiction over Valdez. The judge, therefore, determined that Valdez should be certified as an adult for trial.

The record is replete with evidence that supports the finding of the district court. There was no error in certifying Valdez as an adult.

## MOTION TO ACQUIT

Although Valdez frames this issue to include the sufficiency of the evidence to convict him of all the charges in the amended information, he briefed arguments only as to the charges of aggravated robbery, aggravated kidnapping, and conspiracy to commit aggravated kidnapping. An issue which is not briefed is deemed abandoned. *State v. Patterson*, 262 Kan. 481, 483, 939 P.2d 909 (1997). Therefore, this court will consider the issue of sufficiency of the evidence only as it applies to the convictions of aggravated robbery, aggravated kidnapping, and conspiracy to commit aggravated kidnapping.

In ruling on a motion for judgment of acquittal, if a trial judge concludes from the evidence that a reasonable mind might fairly decide a defendant is guilty beyond a reasonable doubt, the motion must be denied and the case must go to the jury. On appeal, the reviewing court must decide whether a rational factfinder could have found the accused guilty without a reasonable doubt. *State v. Schlein*, 253 Kan. 205, 207-08, 854 P.2d 296 (1993).

## AGGRAVATED ROBBERY

The aggravated robbery charge was based on the taking of Ayon's car and certain belongings in the car. There was testimony that prior to the altercation Ayon willingly gave his car keys to Jose Avalos so that Avalos could use the car and return it to Ayon the following day. Because Avalos peaceably obtained the keys to Ayon's car prior to the fight, Avalos asserts that he also had lawful possession of the car long before taking the car to transport and kill Ayon. Valdez concludes that because Avalos had lawful possession of the car at the time the car was used to kill Ayon, there was no aggravated robbery.

The trial court reasoned that Ayon did not loan the car to Avalos to kill him or to vandalize and abandon the car. The court found

Avalos' use of the car was outside the intent of the loan; therefore, a conviction for aggravated robbery was not precluded.

Aggravated robbery is a robbery committed by a person who is armed with a dangerous weapon or who inflicts bodily harm on any person in the course of the robbery. K.S.A. 21-3427. A robbery is the taking of property from the person or presence of another by force or by threat of bodily harm to any person. K.S.A. 21-3426. To constitute the crime of robbery, it is necessary that the violence to the owner of property must either precede or be contemporaneous with the taking of the property. Robbery is not committed where the thief has gained peaceable possession of the property and uses no violence except to resist arrest or to effect escape. *State v. Hays*, 256 Kan. 48, 64, 883 P.2d 1093 (1994).

We have previously observed that a thief takes possession of the property of another when he exercises dominion and control over the property. Ayon had possession of the keys, but not the car. If the possession of the taker is imperfect in any degree, or his control of the thing desired is qualified by any circumstance, however slight, the taking of possession is incomplete. *State v. Dean*, 250 Kan. 257, Syl. ¶ 3, 824 P.2d 978 (1992).

"At common law, robbery consists of larceny plus two aggravating circumstances. A larceny is aggravated and becomes robbery when (1) the property is taken from the person or presence of another, and (2) the taking is accomplished by the use of force or threatened force (or, as sometimes stated, by putting the victim in fear of injury). Therefore, a defendant commits robbery when, with the intent permanently to deprive, he trespassorily takes and carries away the personal property of another from the latter's person or presence by the use of force or threatened force. On this analysis, a robbery often, but not always, consists of a battery plus larceny or an assault plus larceny. By definition, then, robbery may be classified not only as an offense against property but also as an offense against the person." 4 Wharton's Criminal Law § 454 (15th ed. 1996).

Commission of robbery is complete when the robber takes possession of property; the element of asportation is not required to complete theft or robbery. See K.S.A. 21-3426; *State v. Long*, 234 Kan. 580, Syl. ¶ 2, 675 P.2d 832 (1984), *disapproved in part on other grounds State v. Keeler*, 238 Kan. 356, 365, 710 P.2d 1279 (1985). We have determined that the test of whether a robbery has occurred should be whether the taking of the property has been

completed at the time the force or threat is used by the defendant. In order to constitute a taking, the prospective robber must have obtained at some particular moment the complete, independent, and absolute possession and control of the thing desired adverse to the rights of the owner therein.

Ayon gave his keys to Avalos prior to the taking and the turn of events which ultimately resulted in his demise. Avalos and Valdez did not obtain possession of Ayon's car prior to the violence to Ayon and the subsequent agreement to transport and kill him. They actually took possession of Ayon's car when they put Ayon, nearly unconscious and bleeding, in the back seat of Ayon's car. After taking forceful possession of Ayon's car, Valdez and Avalos then drove Ayon to a secluded area, dragged him out of the car, and ran over him repeatedly with the car. They then departed the area, and later vandalized and abandoned the car. This evidence is sufficient for a jury to find Valdez was guilty of aggravated robbery.

## AGGRAVATED KIDNAPPING AND CONSPIRACY TO COMMIT AGGRAVATED KIDNAPPING

Aggravated kidnapping is the taking or confining of a person, accomplished by force, threat, or deception, with the intent to hold the person to facilitate the commission of any crime or to inflict bodily injury on the person where the person kidnapped sustained bodily harm. See K.S.A. 21-3420(b), (c); K.S.A. 21-3421.

Valdez contends that the only evidence that Ayon was kidnapped was Jose Avalos' testimony that after the party broke up, Valdez and Avalos drove away in Ayon's car with Ayon lying in the back seat asleep or unconscious. He argues that kidnapping requires proof of confinement, and there was no evidence that the badly beaten victim requested to leave the car, attempted to leave the car, or ever was restrained or confined.

Although some of the evidence is circumstantial, a conviction of even the gravest offense may be sustained by circumstantial evidence. See State v. Smith, 245 Kan. 381, 393, 781 P.2d 666 (1989). Without reciting all the testimony, there was sufficient evidence from witnesses from which reasonable minds might fairly decide

Valdez was guilty of aggravated kidnapping and a conspiracy to commit aggravated kidnapping without a reasonable doubt.

## ADMISSION OF RESULTS OF DNA TEST

Julie Kempton, a molecular biologist for Cellmark Diagnostics, testified at trial regarding DNA testing she performed on various fabric and blood samples, including cuttings from blood-stained Nike tennis shoes and a blue denim Dickies jacket. These items had been removed from the Valdez home during execution of the search warrant.

Kempton had performed PCR testing on the fabric samples. She testified that, using the database Cellmark subscribed to, 1 in every 7,600 individuals in the Hispanic population would have genetic markers consistent with those found on the evidence. She concluded that Valdez could not have been the source of the DNA that was extracted from the evidence material, and the victim could not be excluded as a source. Valdez objected to Kempton's qualifications as a statistician and a mathematician and the chain of custody. The court overruled both objections.

## FOUNDATION

Kempton testified that Cellmark Diagnostics is a private DNA testing company that conducts DNA analysis in paternity and criminal cases. For criminal testing, Cellmark has been accredited by the American Society of Crime Laboratory Directors (ASCLAD). Cellmark is the only private laboratory that has received accreditation by ASCLAD.

Valdez contends that the trial court erred in admitting the statistical probabilities because the State failed to provide an adequate foundation for Kempton to testify as an expert as to the formulation and accuracy of Cellmark's database and its acceptance as a database for DNA testing.

The general acceptance test governing the admissibility of scientific evidence in Kansas where a test or standard is required is set forth in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). DNA testing has met the *Frye* test in Kansas. See *State v. Isley*, 262 Kan. 281, 285, 936 P.2d 275 (1997).

In *Isley*, this court addressed a similar challenge to the admission of DNA evidence. As in this case, the testing laboratory in *Isley* was Cellmark, and the testifying expert was not a population geneticist. The Cellmark expert testified concerning statistical probabilities based on her chemical analysis, and the defendant contended that the expert's conclusion lacked the foundation required for scientific evidence. The *Isley* court held that statistics based on population studies are admissible and challenges to the reliability of the testimony goes to its weight, not its admissibility. Population percentages on the possession of certain combinations of blood characteristics, based upon established facts, are admissible as relevant to identification. 262 Kan. at 288; *State v. Dykes*, 252 Kan. 556, 562, 847 P.2d 1214 (1993).

Valdez offers no authority casting doubt on the statistical database, but merely challenges the expert's credentials to testify as to the database. He contends that *Isley* is not applicable because the expert in *Isley* laid a foundation for the statistical database by demonstrating her understanding of the database and the protocols established for using it, whereas, here the expert did not testify accordingly. We find that the distinction is not significant.

The challenge to DNA statistical analysis goes to the weight of the evidence and not to the admissibility. The trial court did not abuse its discretion by admitting the expert testimony regarding the population statistics based on the DNA testing.

## CHAIN OF CUSTODY

Valdez also asserts that because the State failed to provide an adequate chain of custody of items tested, the trial court erred in admitting the DNA results. Police officers found a pair of black Nike tennis shoes in Valdez' home. Maria Garcia, Valdez' stepmother, told police that the shoes belonged to Valdez. The shoes were stained with blood. When tested, the blood was not from Valdez but could have been Ayon's.

Valdez points out that Kempton testified that the evidence custody receipt identified four cuttings from black Nike tennis shoes: Q1A, Q1B, Q1C, and Q1D. However, Kempton testified that Q1A was a swab. Valdez notes that Kempton's report lists Q1A and Q1C

as swabs and Q1B and Q1D as black material. He now asserts that Kempton failed to testify as to how the swabs were prepared.

Although Valdez objected at trial to the admission of Kempton's report based on chain of custody, his argument in the district court concerned the chain of custody in shipping from KBI to Cellmark. The State witness from KBI had testified the items were shipped to Cellmark via Federal Express. Kempton testified that she received the items from Federal Express.

The erroneous admission of evidence may not be raised on appeal absent a timely and specific objection at trial. K.S.A. 60-404; see, e.g., *State v. Sutton*, 256 Kan. 913, Syl. ¶ 4, 883 P.2d 755 (1995). Valdez' argument concerning the number and preparation of the swabs was not raised at trial; therefore, it cannot be raised in the appeal.

## SUPPRESSION OF STATEMENTS

On February 6, 1996, 2 days after the discovery of Ayon's body, Garden City police officers executed a search warrant at Valdez' parents' home. The supporting affidavit for the search warrant identified Abelardo Gonzales, Valdez' stepbrother, as the subject of the investigation.

As provided in the search warrant, the entry team conducted a no-knock entry into the house and found Maria Garcia (Valdez' stepmother), Abelardo Gonzales (Valdez' stepbrother), Jose Avalos, and Valdez in the house. The entry team handcuffed Gonzales', Avalos', and Valdez' hands behind their backs and had them lie on the floor. This was standard procedure exercised for the safety of the officers when conducting a no-knock entry into a residence.

After the residence was secured and the occupants handcuffed, the search team entered the house to search. When Donnie Diehl, of the Finney County Sheriff's Department, entered the house, Valdez and his friends were lying handcuffed on the living room floor.

Officers found drugs and drug paraphernalia in plain view during the search. No charges resulted from the discovery. Valdez was uncuffed shortly after the search of the residence, and he was searched for weapons.

Diehl then asked Valdez to come in a bedroom where he explained to Valdez that he (Diehl) was going to search for bloody clothing and other evidence of the fight that occurred on Chesterfield Street. Diehl asked Valdez if he had seen the fight or heard about it. Valdez denied any knowledge of the fight. Valdez told Diehl that he and Avalos left the party at approximately 11 p.m. and walked to Valdez' home.

Diehl asked Valdez which bedroom was his, and Valdez directed Diehl to the appropriate room. Diehl had Valdez sit in the living room while he searched the bedroom. Valdez and his friends sat on the couch and on the floor in front of the couch while the officers brought out bloody clothing found in the bedroom and asked Valdez to identify who owned the particular items. Valdez responded that a pair of black Nike tennis shoes and a pair of jeans belonged to a friend. The officers' search took approximately 2 hours. Valdez was released from custody at the conclusion of the search.

Prior to trial, Valdez moved to suppress the statements he made during the February 6, 1996, search. At the suppression hearing, Diehl testified that he believed Valdez had been advised that he was not under arrest, but Diehl had no specific recollection of any officer advising Valdez of the fact. Diehl was sure that Valdez was not advised of his *Miranda* rights during the search.

The trial court denied Valdez' motion to suppress, finding that Valdez was not under arrest during the execution of the search warrant. The judge reasoned:

"If, in fact, that [a drug] charge had come forward and that charge had, in fact, been filed, it certainly then, would have led [sic] credence to Mr. Valdez' statement that all this interrogation or asking of questions or investigation incident to this search, was as a result of an arrest and an in custody interrogation or interview."

The court also relied on the fact that the search warrant and the accompanying affidavit identified Abelardo Gonzales, not Adam Valdez, as a suspect.

Normally, when a trial court conducts a full pretrial hearing on the admissibility of an extrajudicial statement by an accused, determines the statement was freely and voluntarily given, and admits

the statement into evidence at the trial, this court accepts that determination if it is supported by substantial competent evidence. *State v. Lewis*, 258 Kan. 24, 36, 899 P.2d 1027 (1995).

This standard of review does not apply. The trial court used the wrong test in its analysis of the issue. In *Stansbury v. California*, 511 U.S. 318, 128 L. Ed. 2d 293, 114 S. Ct. 1526 (1994), the United States Supreme Court held that whether the interrogating officers had focused their suspicions upon the individual being questioned is not relevant for purposes of *Miranda* if those suspicions are not disclosed to the defendant. 511 U.S. at 326. The Court held that an officer's knowledge or beliefs may bear upon the custody issue if they are conveyed to the individual being questioned, but they are relevant only to the extent they would affect how a reasonable person would gauge his or her freedom. The determining factor in deciding whether a *Miranda* warning is required is whether the person has been taken into custody. The subjective belief of the officer is not an issue in determining whether a suspect is in custody for purposes of *Miranda* unless it is actually communicated to the suspect. See 511 U.S. at 325.

*Miranda* warnings are required where there has been such a restriction on a person's freedom as to render him or her in custody. An objective standard is used to judge whether an interrogation is custodial. The proper analysis is how a reasonable person in the suspect's position would have understood the situation. *State v. Fritschen*, 247 Kan. 592, Syl. ¶ 2, 802 P.2d 558 (1990).

There were significant restraints on Valdez' liberty during the execution of the search warrant. Clearly, a reasonable person in Valdez' position would have believed he was in custody. The questions asked by the officers during the search constituted a custodial interrogation for purposes of *Miranda*. This conclusion, however, does not resolve the issue.

Although Detective Diehl stated at the suppression hearing that Valdez identified items of clothing as belonging to him during the search, the particular clothing Valdez identified was not specified. It is not clear from the hearing if any of the clothing identified by Valdez as his was clothing that was used against him at trial. It is clear that the black tennis shoes were found in Valdez' closet, but

the detectives testified that it was Maria Garcia, Valdez' step-mother, who identified the shoes as belonging to Valdez.

Valdez objected at trial to statements made by him during the search. Valdez provides a citation to the record of his objection. We note that at that point in the trial, Detective Diehl was testifying to Valdez' responses to Diehl's questions during the search. However, a review of the statements reveals that Valdez' responses were not admissions and were not incriminating. Detective Diehl testified that Valdez responded to questions regarding whether he went to the party on Chesterfield Street, how long he stayed, whom he left with, and where they went after the party. Valdez admitted to being at the party, staying until 11 or 11:30, leaving with Jose Avalos, and going to his home afterwards.

If incriminating statements were made by Valdez and those statements were used against him in court, Valdez has failed to designate those statements in the record. An appellant has the burden of furnishing a record which affirmatively shows that prejudicial error occurred in the trial court. *State v. Moncla*, 262 Kan. 58, 68, 936 P.2d 727 (1997). Valdez has failed to demonstrate that he was prejudiced in any way from the admission of statements made during the execution of the search warrant in violation of *Miranda*.

Valdez also contends that a subsequent statement he made to police on February 20, 1996, was admitted at trial in violation of *Miranda*. On that date, police officers came to Valdez' place of employment and requested that he accompany them to the police station. Valdez agreed. The officers told Valdez that they wanted to go over his account of the events of February 3-4, 1996. Valdez answered that he had previously lied regarding the hour he went home from the party because he was afraid he would be arrested for curfew violation. The officers immediately advised Valdez of his *Miranda* rights and arrested him. Valdez argues that his statement prior to his arrest admitting he lied to the police was the result of a custodial interrogation.

The Supreme Court has not overruled the general rule that any statement made by a person during custodial police interrogation cannot, over the person's objection, be admitted in evidence

against the person at trial, even though the statement may in fact be wholly voluntary, unless the police, before interrogation, informed the person that he or she has a right to remain silent, that any statement the person makes may be used as evidence against that person, and that the person has a right to the presence of an attorney, either retained or appointed. An exception to the general rule is that absent deliberately coercive or improper tactics by law enforcement officers in obtaining an initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement while in custody may remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his or her rights. *State v. Lewis*, 258 Kan. at 36.

Some volunteered statements are not barred by the Fifth Amendment. The special procedural safeguards stated in *Miranda* are not required where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation. "Interrogation," as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself. Since police cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation extends only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response. *Rhode Island v. Innis*, 446 U.S. 291, 299-302, 64 L. Ed. 2d 297, 100 S. Ct. 1682 (1980).

Absent deliberate coercive or improper tactics by police in obtaining an initial statement, the fact that a suspect has made an unwarned admission does not require a presumption of compulsion. In determining whether an incriminating statement is voluntary, a court is to look at the totality of the circumstances. The burden of proving that a confession or admission is admissible is on the prosecution, and the required proof is by a preponderance of the evidence. When a trial court conducts a full pretrial hearing on the admissibility of an extrajudicial statement by an accused,

determines the statement was freely and voluntarily given, and admits the statement into evidence at the trial, this court accepts that determination if it is supported by substantial competent evidence. 258 Kan. 24, Syl. ¶ 4.

When the officers told Valdez they wanted to discuss his statement of what occurred the night of the murder, Valdez immediately answered that he had previously lied to the officers. The officers immediately arrested Valdez and advised him of his *Miranda* rights. There is no evidence of coercion or an attempt to undermine a suspect's ability to exercise free will.

## REQUIRING A WITNESS TO TESTIFY

Prior to Valdez' trial, Jose Avalos pled guilty to felony murder for his participation in the murder of Juan Ayon. Avalos had not yet been sentenced for felony murder. Avalos moved to withdraw his plea. The court denied his motion. The appeal of the denial of Avalos' motion to withdraw was still pending at the time of Valdez' trial.

Avalos, invoking his Fifth Amendment right against self-incrimination, refused to testify at Valdez' trial. Over Valdez' objection, the trial court found that Avalos had previously waived his privilege against self-incrimination by testifying under oath regarding his involvement in the murder of Ayon at Valdez' preliminary examination and ordered Avalos to testify. The court concluded that Valdez had no standing to object to a violation of Avalos' Fifth Amendment rights.

Whether the trial court erred in ordering Avalos to testify in violation of Avalos' Fifth Amendment right against self-incrimination is a question of law. An appellate court's scope of review on questions of law is unlimited. *State v. Anderson*, 259 Kan. 16, 18, 910 P.2d 180 (1996).

There is no doubt that an individual's right against self-incrimination extends through sentencing. However, the right against self-incrimination pertains only to the person incriminated by his own testimony, not to others incriminated by his testimony. The right against self-incrimination is personal to the witness, and the defendant in a criminal action has no standing to assert the witness's

privilege. *State v. Smallwood,* 223 Kan. 320, Syl. ¶ 5, 574 P.2d 1361 (1978).

Valdez had the right to cross-examine the reluctant witness and cannot be protected by Avalos' Fifth Amendment right not to testify against himself. The trial court correctly found that Valdez had no standing to object.

## REBUTTAL EVIDENCE

During the search, black Nike tennis shoes stained with blood consistent with the DNA properties of Ayon's blood were taken from Valdez' bedroom closet. Defense Exhibit S indicated that Valdez owned blue, rather than black, tennis shoes. The defense called Dennis Asper, a jailer, who testified that a pair of blue Nike tennis shoes, admitted into evidence, were included in Valdez' property when he was booked into jail. The State called Cassandra Warren on rebuttal. The State expected Warren to testify that Valdez had worn black Nike tennis shoes at the party on the night of the murder. Valdez objected to the State's introduction of rebuttal testimony. However, when asked, Warren was unable to recall the color of Valdez' shoes.

Rebuttal evidence is evidence that is presented to deny some fact an adverse party has attempted to prove or has placed in dispute. The use and extent of rebuttal evidence rests in the sound discretion of the trial court. The erroneous admission of rebuttal evidence will not be grounds for reversal unless it appears discretion has been abused to the appellant's prejudice. *State v. Thompkins,* 263 Kan. 602, Syl. ¶ 5, 952 P.2d 1332 (1998).

The testimony regarding the disputed color of Valdez' shoes was proper rebuttal under the circumstances. The court did not abuse its discretion in allowing the rebuttal. However, even if the rebuttal testimony had been erroneously admitted, the testimony did not prejudice Valdez because the rebuttal witness could not recall the color of Valdez' tennis shoes.

Valdez also contends that the trial court erred in allowing the State to present rebuttal evidence establishing that Valdez' brother, Walter, was a Y.C. gang member.

Walter Valdez testified in the defense case at trial. On cross-examination, Walter Valdez testified that he was not a Y.C. gang member. As to his acquaintance with the gang members, Walter Valdez stated, "They were just friends from school that I'd see around town and [say] hello and, you know, how you doing and — and that was it." To rebut Walter Valdez' testimony, the State presented the testimony of Detective William Relph who testified that Walter Valdez was considered by police to be a gang member. He presented photographs of Walter flashing gang signs.

When the defendant opens a subject on direct or cross-examination, the State may develop and explore various phases of that subject. *State v. Thompkins*, 263 Kan. at 624. The trial court did not abuse its discretion in permitting the State to rebut Walter Valdez' statements.

## EVIDENCE OF GANG AFFILIATION

The evidence of gang affiliation is admissible to show motive for an otherwise inexplicable act. However, that evidence is admissible only where there is sufficient proof that such membership or activity is related to the crime charged. *State v. Tran*, 252 Kan. 494, 847 P.2d 680 (1993).

Valdez contends that the trial court erred in admitting evidence of his gang membership. Valdez asserts that the initial argument at the party was between two non-gang members and the subsequent beating of Ayon involved both gang and non-gang members. Therefore, argues Valdez, the killing of Ayon was not a gang activity and gang affiliation had no bearing on the case and was not relevant to an issue in the case.

The standard of review regarding the admission of gang affiliation is whether the trial court abused its discretion. *State v. Hooks*, 251 Kan. 755, 765, 840 P.2d 483 (1992).

There was no evidence suggesting that Jose Avalos or Valdez had a personal motive for killing Ayon. There was testimony by which the jury could reasonably infer that the killing of Ayon was ordered by the leader of the Y.C. gang, Richard Garcia, and that the order was given to Jose Avalos and Valdez, who were both gang members. There was also evidence that Jose Avalos participated in the killing

only because he was threatened with violence by the gang if he refused. Valdez' gang affiliation, therefore, was evidence that explained an otherwise inexplicable act. As such, it was directly related to the killing of Ayon. The trial court did not err in admitting evidence of Valdez' gang affiliation.

## EVIDENCE OF ANOTHER SUSPECT

There were two distinct sets of shoe impressions found in the snow in the area around Ayon's abandoned car. One shoe print appeared to come from a Nike shoe and the other from a hiking boot. The individuals whose shoes made the prints had departed from the victim's car and had traveled through alleys, over fences, and around houses. Where they often encountered dead-ends, the individuals had turned around and continued to travel toward an apartment complex where impressions left by car tracks indicated they departed the area in a car.

To show that another person may have committed the crime, Valdez proffered evidence outside the presence of the jury that the police had received an anonymous call on February 5, 1996, from a person who stated he had talked to a man named Francisco Herrera. Herrera had told the anonymous caller that David Ramirez, the man Ayon purportedly threatened to report to the police regarding drug crimes, was involved in the killing of Ayon.

Outside the presence of the jury, Valdez examined the police officer who received the anonymous telephone call. The officer testified that the caller said Francisco Herrera lived at the apartment complex near the house on Chesterfield Street. Herrera had told the caller that Ayon had been killed and the perpetrators had moved his body to another location. The caller also told the police officer Herrera had worked with Ramirez at IBP, and word was circulating around IBP that three men had beaten Ayon with a baseball bat and then run over him with a car. The caller had been told by Herrera that Ramirez had quit his job at IBP and moved to Texas or Mexico right after the murder.

Valdez also proffered that Monica Lucero, an ex-girlfriend of David Ramirez, lived in the area where Ayon's abandoned car was found. The shoeprints leading from the car indicated that the sus-

pects had stopped in the vicinity of Monica Lucero's house. There were no shoe prints indicating that the suspects had entered the house or that a person from inside the house had joined the suspects. The police had not considered this of any consequence because the dead end at Monica Lucero's house was one of many dead ends taken by the suspects after they left the victim's car.

The court informed Valdez that the only way he could present evidence that David Ramirez had committed the crime was to have Monica Lucero testify that she actually saw Ramirez near her house after the homicide. Valdez informed the trial court that he had not been able to locate either Monica Lucero or Francisco Herrera.

Because Valdez could not locate either Monica Lucero or Francisco Herrera, the court refused to allow Valdez to introduce the anonymous caller's statements into evidence.

Monica Lucero appeared at trial after the close of Valdez' evidence. The court permitted Valdez to proffer Lucero's testimony outside the presence of the jury. Lucero stated that she and David Ramirez had a child together. She was not at home the night Juan Ayon was killed, nor did she see David Ramirez that night. Lucero said that Ramirez told her that Ayon had asked him for drugs, but Ramirez had refused to deal with him. Ramirez did not say that he killed Ayon or had Ayon killed. Lucero said that Ramirez had moved to Texas immediately after he was fired from IBP.

The court found that Lucero's proffered testimony did not establish a nexus between Ramirez and the death of Juan Ayon; therefore, her testimony was not relevant. The court denied Valdez' request to re-open his case or allow Lucero to testify.

Valdez contends that the trial court's refusal to allow him to introduce evidence regarding the possibility that David Ramirez was a perpetrator in the crime against Ayon denied him the right to present evidence supporting his theory of defense. He argues that an appellate court standard of review is de novo because the issue involves the denial of his constitutional right to a fair trial.

The State contends that the issue is not Valdez' right to present a defense but concerns the trial court's discretion in refusing to admit evidence. The State argues that the trial court correctly refused to allow the introduction of evidence because Valdez failed

to lay a proper foundation or demonstrate the relevance of the evidence.

The question of whether the trial court erred in excluding evidence is subject to an abuse of discretion standard of review. *State v. Gardner*, 264 Kan. 95, 103, 955 P.2d 1199 (1998). The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations. *Chambers v. Mississippi*, 410 U.S. 284, 294, 35 L. Ed. 2d 297, 93 S. Ct. 1038 (1973). Limitations placed on the accused's ability to present a defense can, in some circumstances, be severe enough to violate due process.

A defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions. See *Taylor v. Illinois*, 484 U.S. 400, 410, 98 L. Ed. 2d 798, 108 S. Ct. 646 (1988); *Rock v. Arkansas*, 483 U.S. 44, 55, 97 L. Ed. 2d 37, 107 S. Ct. 2704 (1987); *Chambers*, 410 U.S. at 295. A defendant's interest in presenting such evidence may " 'bow to accommodate other legitimate interests in the criminal trial process.' " *Rock*, 483 U.S. at 55 (quoting *Chambers*, 410 U.S. at 295).

The information Valdez considered to be of primary importance to Valdez in the telephone tip was that Ramirez had quit his job at IBP and had moved to Texas or Mexico. Counsel for Valdez argued that this information was relevant because the police had focused on Valdez only after finding that he and Avalos had attempted to borrow money from their friends to leave town. The court found that Ramirez' alleged urgent plans to leave town did not, without more, implicate him in any crime. The court noted that Ramirez could have felt the need to leave town for any number of reasons including that he had information he did not want to disclose regarding the killing of Ayon.

The accused does not have an unfettered right to offer evidence that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence. *Montana v. Egelhoff*, 518 U.S. 37, 42, 135 L. Ed. 2d 361, 116 S. Ct. 2013 (1996). The court did not err in excluding the anonymous caller's unsubstantiated tips. As there was no error, constitutional or otherwise, Valdez' issue fails.

### PROSECUTOR REMARKS

During closing argument, the prosecutor made the following statement:

"There's all kinds of evidence with regard to how many times they ran over Mr. Ayon. We have Jose Avalos, who was there telling us. We have the doctor telling — Dr. Melin telling us. We have Adam Valdez telling us."

The defense counsel objected on the ground that Valdez had not made any statements to the jury. The court instructed the prosecutor to identify the witnesses who made the statements. The prosecutor continued:

"I apologize, Your Honor. I think that Carlos Valencia indicated that he had spoken with [Valdez] and [Valdez] indicated that they had run [Ayon] over several times. So, we do have that."

Valdez contends that the misstatement by the prosecutor called attention to the fact that he did not testify at trial. He argues that the trial court had a duty to admonish the jury to disregard the statement.

The prosecutor's misstatement was clearly an inadvertent error which he promptly corrected. The correction obviated any need for further admonishment by the court. Under the circumstances, further attention by the court would have only exacerbated the error. The court did not err in failing to give an admonishment.

Valdez also takes issue with a statement by the prosecutor during closing argument regarding the testimony of Carlos Valencia. Valencia testified on behalf of the State in hopes of favorably influencing plea negotiations in a pending criminal case against him. Regarding Valencia's testimony, the prosecutor stated:

"Then, Carlos Valencia. I didn't make any deals with him. He's — he can call it what — he can call me a liar if he wants to because he's called everybody else one but I didn't make a deal with him. I have never made a deal with that man. To this day, there's no deal. Never has been. He's crying. When he's in the Police Department, this big, tough gangster's crying his eyes out, not because he's afraid of the police but because he's afraid of all these people?"

The defense counsel objected, and the prosecutor continued, "All these people, gangsters." The objection was then overruled.

Valdez contends that the statement regarding Valencia's reason for crying in his police statement was a statement of facts not in evidence. Furthermore, he argues, the characterization of Valencia and his friends as "gangsters" was erroneous and prejudicial.

Carlos Valencia testified that when he gave a statement to the police regarding his knowledge of the crime against Ayon, he cried. He further testified that he had been reluctant to cooperate with the police in obtaining a recorded confession from Valdez and Avalos because he was afraid of Valdez and Valdez' friends. Valdez contends that the prosecutor's comments are not grounded in fact because Valencia did not testify that the reason he cried at the police station was because he was afraid of Valdez' friends.

In closing argument, the prosecutor may comment on the evidence and draw reasonable inferences from the evidence. The inference that Valencia cried at the police station because he was afraid of Valdez' friends is a reasonable inference from Valencia's testimony.

Regarding term "gangster" in closing, Valdez argues he had never been adjudicated a juvenile offender, so the term is factually inaccurate.

The State defines "gangster" as "gang member," and Valdez defines the word as "criminal." Certainly, the term "gangsters" has both connotations. Neither connotation is outside reasonable inferences from the evidence in this case. Most of the witnesses to the events at the party on Chesterfield Street admitted to Y.C. gang membership. Others, who denied gang membership, were identified by police as gang members. Most admitted to criminal activities, whether or not those activities resulted in adjudications or convictions.

Fair comment on evidence should not be discouraged. The prosecution can make comments on the evidence so long as the comments are confined to the evidence and reasonable inferences which can be drawn from the evidence. *State v. Graham*, 247 Kan. 388, 397, 799 P.2d 1003 (1990).

In criminal trials, the prosecution is given wide latitude in language and in manner or presentation of closing argument as long as it is consistent with the evidence adduced. Improper remarks

made by the prosecutor in closing argument are grounds for reversal only when they are so gross and flagrant as to prejudice the jury against the defendant and to deny the defendant a fair trial. *State v. Baacke*, 261 Kan. 422, Syl. ¶ 4, 932 P.2d 396 (1997).

In closing argument, the prosecutor may draw reasonable inferences from the evidence, but may not comment upon facts outside the evidence. Counsel may make impassioned appeals to the jury, but should not inject issues broader than the accused's guilt or innocence or make predictions about the consequences of the jury's verdict. 261 Kan. 422, Syl. ¶ 5.

The prosecutor's remarks refer to facts in evidence and reasonable inferences that can be drawn from the evidence. Therefore, in this case, the prosecutor's remarks were not error.

## CUMULATIVE ERROR

Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied him a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant. *State v. Castoreno*, 255 Kan. 401, 411, 874 P.2d 1173 (1994) (quoting *State v. Lumbrera*, 252 Kan. 54, 57, 845 P.2d 609 [1992]).

The evidence in this case was difficult due to the vacillating versions of the events related by the witnesses in their statements to the police and at trial, and the complicated DNA evidence. However, Valdez has cited no trial error sufficient to require reversal of his conviction. Therefore, this issue has no merit.

## IMPOSING 40-YEAR MANDATORY PRISON SENTENCE

Where a defendant is convicted of murder in the first degree based upon the finding of premeditated murder, the court shall determine whether the defendant shall be required to serve a mandatory term of imprisonment of 40 years or be sentenced as otherwise provided by law. K.S.A. 21-4635(a). In order to make the determination, the court may consider evidence concerning any matter that the court deems relevant. The court shall include a

consideration of the aggravating circumstances enumerated in K.S.A. 21-4636 and any mitigating circumstances. K.S.A. 21-4635(b).

In this case, the trial court reviewed the aggravating factors found at K.S.A. 21-4636 and found that Valdez committed the murder of Juan Ayon in an especially heinous, atrocious, or cruel manner. The court then found that the aggravating factor was not outweighed by the mitigating factors of age and lack of criminal history.

Valdez contends that there was no clear testimony that Ayon was run over by the car more than once, or if Ayon had been run over several times, that he was alive after the initial impact. Valdez further argues that Ayon may not have perceived his impending death due to his extremely intoxicated state.

"Where the sufficiency of the evidence for establishing an aggravating circumstance under K.S.A. 21-4636 is challenged, the standard of review is whether, after a review of all the evidence, viewed in the light most favorable to the State, a rational factfinder could have found by a preponderance of the evidence the existence of the aggravating circumstance." *State v. Spain*, 263 Kan. 708, Syl. ¶ 6, 953 P.2d 1004 (1998) (changing the standard of review as expressed in *State v. Brady*, 261 Kan. 109, Syl. ¶ 4, 929 P.2d 132 [1996]).

It was clear from the medical testimony at trial that Juan Ayon was alive when he was dragged out of his car into a field. Ayon was then run over between 3 and 7 times and dragged under the car for some distance. Dr. Melin concluded that based on the injuries, Ayon's death occurred within a few minutes after he suffered the impact injuries. Under the facts, there was sufficient evidence for the court to find beyond a reasonable doubt that the manner in which Valdez killed Ayon was especially heinous, atrocious, or cruel.

Affirmed.